UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| CHARLES AXL ROSE and JESSICA ELDRIDGE, individually and as Administrators of the Estate of Charles Lee Rose,<br><br>Plaintiff<br><br>V.<br><br>MCCREARY COUNTY, KENTUCKY, et al.,<br>Defendants | Civil No. 14-111-GFVT<br><br>**MEMORANDUM OPINION**<br>**&**<br>**ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Before the Court are the parties' respective motions for summary judgment. [R. 48, 54.] Plaintiffs Charles Axl Rose and Jessica Eldridge brought this suit individually and on behalf of their father Charles Lee Rose, who died in 2014 after suffering a drug overdose at the Wayne County Detention Center in Monticello, Kentucky. [R. 54-2 at 3.] The Court will now DENY the Plaintiffs' motion for partial summary judgment and GRANT the Defendants' motion.

**I**

On February 17, 2014, McCreary County Deputy Sheriff Joe Horne pulled over and arrested Charles Lee Rose "for failure . . . to maintain required insurance, failure to produce [an] insurance card, [having] no registration plates [or] registration receipt, possession of drug paraphernalia, driving on [a] DUI-suspended license and operating a motor vehicle under the influence of drugs or alcohol." [R. 48-1 at 2.] Horne reported that Rose's "pupils were constricted and unresponsive to light being shone in them," that "[h]is speech was slow and slightly slurred," and that he was "very unsteady" on his feet when asked to perform "heel to toes" and "one leg stand" sobriety tests. [R. 56-1 at 1.] Horne later suggested that Rose was not

"falling down" during the sobriety tests, but was simply "having trouble doing the test." [R. 56 at 12.] After taking Rose into custody, Horne "stop[ped] by EMS to have Mr. Rose's blood drawn, but was unable to do so because EMS would not respond."[1] [R. 48-1 at 2.]

Because McCreary County "has no operating jail," Horne handed Rose over to Officer Jimmy Duncan, who dropped Rose off at the nearby Wayne County Detention Center. [R. 54-2 at 4.] Duncan remembers that he and Rose "talked some" during the transport and that Rose was "awake and alert." [R. 54-7 at 1.] He also states that Rose was "awake and alert when [they] went into [the] detention center," and that Rose "was alert and standing talking to [him] when [he] left" the center. [*Id.*]

Officer Brad Tucker then booked Rose into the facility. Tucker recalls that Rose "appeared fine," that his "[m]otor skills were good," and that he was walking and talking. [R. 59 at 7.] When Tucker asked him the standard screening questions at booking, Rose indicated that he did not "have a serious medical condition that m[ight] require attention" and that he had not "recently ingested potentially dangerous levels of drugs or alcohol." [R. 54-10 at 1.] In his deposition, Tucker acknowledged that inmates who "come[ ] in intoxicated" are usually "not going to tell the truth," and noted that Rose appeared to be "just saying no to all [his] questions, staring off." [R. 52 at 9.] Rose did, however, answer "yes" when asked if he understood that he could "request a health care provider at any time," if he "understood all the questions" that

---

[1] In his deposition, Horne suggests that EMS may have unjustifiably refused to draw Rose's blood. He states that EMS told him no one was available to take the blood sample, even though "all the trucks were in the base" when he drove by the facility. [R. 56 at 16.] The Plaintiffs claim that "there was a conflict between the McCreary County Sheriff's Department and EMS at that time which is evidenced by a newspaper article in the local paper." [R. 48-1 at 2] (citing R. 50-2 at 1.) Because any investigation of this issue would not affect the resolution of this dispute, the Court will not consider Horne's or the Plaintiffs' allegations.

Tucker had asked him, and if he had provided "all the information that [he] wanted [the officers] to be aware of" while he was at the facility. [R. 54-10 at 1.]

After Rose answered Tucker's questions, Officer Danny Jarvis escorted Rose to a cell. [R. 54-9 at 1.] Jarvis reports that Rose "picked up his bed matt, rolled it up and walked into his cell" of his own volition. [*Id.* at 1-2.] In interviews conducted by Ray Upchurch (the Wayne County Jailer) with Rose's fellow inmates after his death, one inmate suggested that Rose "came in [to the cell] sick" and appeared to be in "very rough shape." [R. 58-1 at 11.] Other inmates recalled that Rose "was talking to them pretty much all night, so they lost sleep." [R. 58 at 48.]

Because officers had placed Rose under detox observation, Kentucky regulations required them to "conduct and document direct in-person surveillance" of him "on an irregular schedule, at least every twenty (20) minutes." 501 KAR 3:060 § 2(2)(c). A few months before Rose's death, Upchurch had also sent a letter to employees demanding that all officers "ask people in detox a question every 15 min[utes]." [R. 58-1 at 16.] Upchurch wrote that "if they are not checked every 15 min and [you fail to] ask a question and they die your paperwork will go to court[,] so do it, and write it down correctly." [*Id.*]

On the night in question, it was Jarvis's responsibility to check on Rose periodically. [R. 59 at 11.] The record shows that the intervals between Jarvis's check-ins with Rose varied widely. At some stages of the night, those intervals were as short as ten minutes. [R. 54-11 at 1.] At another point, Jarvis waited around eighty-five minutes to check on Rose, apparently because there was wax on the floor around his cell. [*Id.*] Later, around 4:31 a.m., Jarvis reported that he had checked in and Rose had "looked up" from his bed. [*Id.*] Jarvis did not update the check-in log again for about 45 minutes, when he reported discovering "a white drool" coming out of Rose's mouth and chin. [R. 54-9 at 2.] Tucker says that Jarvis alerted him to a problem

3

with Rose at around 5:05 am, after which they tried to wake Rose without success. [R. 54-12 at 1.] The officers then called EMS responders, who transported Rose to the hospital. He died on February 24, 2014. [R. 48-1 at 4.] The coroner determined that he had died of a drug overdose. [R. 54-5 at 6.]

The co-administrators of Rose's estate ("the Administrators") brought this suit a few months later. They now seek damages under 42 U.S.C. § 1983, alleging that each Defendant showed deliberate indifference to Rose's serious medical needs. [R. 100 at 3.] They also charge McCreary County and Wayne County with (1) adopting unlawful polices and/or customs that resulted in Rose's death and (2) failing to provide adequate training to county officers.[2] [*Id.* at 9.] Lastly, they bring an assortment of state law claims against the Defendants, including wrongful death, violations of 501 KAR 3:060 and 3:090, negligence and gross negligence, and the tort of outrage. [*Id.* at 9-10.] The Administrators seek summary judgment only in relation to their municipal liability claims under 42 U.S.C. §1983, while the Defendants seek summary judgment on all claims. [R. 48-1, R. 54-2.]

## II

### A

#### i

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine

---

[2] Although the Administrators' suit names both McCreary County and Wayne County as defendants, their motion for partial summary judgment addresses only the conduct of Wayne County. And their complaint refers only to "the Defendant's . . . policies, customs, and practices," with no indication of who that "Defendant" might be. To ensure that the Court resolves all of the Administrators' intended claims, however, the Court will address the liability of both counties.

4

dispute exists when the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Put differently, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*. at 252.

The moving party has the initial burden of identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the movant has satisfied this burden, "the nonmoving party must go beyond the pleadings and come forward with specific facts to show there is a genuine issue for trial." *Chao*, 285 F.3d at 424 (citing *Celotex*, 477 U.S. at 324). The nonmoving party, however, "must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Chao*, 285 F.3d at 424 (internal citations omitted).

The trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact," and "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). And "[w]hen reviewing cross-motions for summary judgment, the court must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir. 1991)).

5

**ii**

When measuring the Administrators' individual-capacity claims against this standard, the Court must first determine whether the Defendants are immune from suit. Under federal law, the doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In other words, this doctrine requires the Court to answer two questions: whether the defendant violated a constitutional right, and whether that right was clearly established at the time of the offense. *Pearson,* 555 U.S. at 232. The Court may consider these questions in any order, but if the answer to either question is "no," the defendant is immune from suit. *Id.* at 236. The plaintiff bears the burden of demonstrating that a defendant is not entitled to qualified immunity, although the Court must still construe the facts in a light most favorable to the plaintiff and draw all reasonable inferences in that party's favor. *Scott v. Harris,* 550 U.S. 372, 377 (2007). The qualified immunity doctrine turns on a recognition "that reasonable mistakes can be made as to the legal constraints on particular police conduct," and thus shields "all but the plainly incompetent or those who knowingly violate the law" from suit. *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008) (internal quotations and citations omitted).

**B**

With these standards in mind, the Court will first address the Administrators' federal claims against each Defendant. The Fourteenth Amendment empowers pretrial detainees to argue, under 42 U.S.C. § 1983, that jail officials showed deliberate indifference to their serious medical needs. *Border v. Trumbull Cty. Bd. of Comm'rs*, 414 F. App'x 831, 835 (6th Cir. 2011). To succeed on this claim, the plaintiff must satisfy both an objective and subjective test. The

objective element requires the plaintiff to show that his medical needs were "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under the subjective component, the plaintiff must demonstrate that "the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Woods v. Lecureux*, 110 F.3d 1215, 1222-23 (6th Cir. 1997). This standard lies "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Farmer,* 511 U.S. at 836. Put differently, a jail official "may not escape liability if the evidence show[s] that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (internal quotations omitted) (citation omitted). To determine each officer's state of mind, however, the Court cannot impute the knowledge of one officer to another. *See, e.g., Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).

In the context of an inmate overdose, "a pretrial detainee's generalized state of intoxication, without more, is insufficient to establish a serious medical need or an officer's deliberate indifference to a substantial risk of serious harm to a detainee." *Border*, 414 F. App'x at 837. And evidence that a jail official "*should have* known that [an inmate] swallowed drugs" is "not enough" to establish deliberate indifference. *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). Instead, the plaintiff must show that (1) jail officials were "aware of facts from which the inference could be drawn that a substantial risk of [overdose] existed," (2) they actually "drew that inference," and (3) they then "chose to disregard the risk." *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009).

To demonstrate that Rose's medical needs were "sufficiently serious" here, the Administrators must show that those needs were "so obvious that even a layperson would easily

7

recognize the necessity for a doctor's attention." *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009). The record indicates that, at worst, Rose's speech was "slow" and "slightly slurred," his pupils were "constricted and unresponsive to light," and he was "very unsteady" on his feet when he attempted "heel to toes" and "one leg stand" sobriety tests. [R. 56-1 at 1.] After his overdose, one inmate also recalled that he appeared to be "sick" and in "very rough shape" after entering the detox cell. [R. 58-1 at 11.] But the record also repeatedly establishes that Rose was otherwise "alert," talkative, responsive to questions, and able to walk on his own. [R. 54-7 at 1, R. 59 at 7, R. 54-9 at 1-2, R. 54-10 at 1.] And he answered "no" when asked if he had "recently ingested potentially dangerous levels of drugs or alcohol," and "yes" when asked if he had "provided [jail personnel] with all the information that [he] want[ed] [them] to be aware of while" he was at the facility. [R. 54-10 at 1.]

On these facts, the Court finds scant evidence to suggest that Rose's symptoms reflected more than a "generalized state of intoxication," or that his medical needs were "so obvious" that "even a layperson would easily recognize the necessity for a doctor's attention." *Border v. Trumbull Cty. Bd. of Comm'rs*, 414 F. App'x 831, 835 (6th Cir. 2011). But here, because the Administrators have altogether failed to "satisfy [the] high standard of culpability for any of the [individual] defendants," the Court "need not decide whether [Rose] faced an objectively serious risk of harm." *Meier v. Cty. of Presque Isle*, 376 F. App'x 524, 529 (6th Cir. 2010); *see also Mingus v. Butler,* 591 F.3d 474, 481 (6th Cir. 2010) ("Even if we assume, without deciding, that

[the inmate] faced an objectively serious risk of harm, [the defendant] was not deliberately indifferent to that risk.").[3]

To satisfy the subjective component, the Administrators must show that (1) the individual Defendants "perceived" and were actually "aware" of an obvious risk that Rose would overdose, and (2) they then chose to ignore the risk. *Watkins*, 273 F.3d at 688. Here, no evidence in the record reasonably indicates that the Defendants subjectively perceived and then ignored an obvious risk of overdose.[4] One of these Defendants, Karen Goolby, is named once in the Administrators' complaint as an "employee" of Wayne County who allegedly "knew of Mr. Rose's distress and/or participated in his mistreatment." [R. 1 at 6.] Neither the complaint nor any of the Administrators' later filings provide any facts to support this claim. The Administrators' conclusory statement that she "knew of" and/or "participated in" the alleged misconduct, without more, is facially insufficient to survive summary judgment.

---

[3] In their motion for partial summary judgment, the Administrators also argue that jail personnel showed deliberate indifference by violating their "emergency medical services policy by not contacting the nurse for someone having an emergency in which Mr. Rose met that classification as in the least he was going into drug withdrawal which the deputies were on notice." [R. 48-1 at 9.] The Court cannot make sense of this claim. The facility's policy does require emergency services for detainees experiencing "drug or alcohol withdrawal." [R. 58-1 at 6.] But there is no evidence that Rose was suffering from withdrawal. The Administrators are apparently confusing drug *overdose*—which the coroner identified as Rose's cause of death—with drug *withdrawal*. Those are two very different phenomena. In any case, as this order demonstrates, no Defendant actually perceived and then ignored an obvious risk that Rose would overdose.

[4] The Court notes that, in all of their filings, the Administrators fail to cite to the docket entry numbers corresponding to the documents they reference. Instead, they simply refer to the "Depo" of various Defendants, with no indication of where these depositions might be found in the record. In some cases, too, the Administrators fail even to cite to a page number, referring only to "exhibits" and apparently expecting the Court to dig through the record to find the relevant passage. The Court admonishes the Administrators' counsel to provide docket entry and page numbers in all future filings in federal court. It is not the role of this Court to scour the record for documents referenced in the Administrators' filings. *See Penn, LLC v. Prosper Bus. Dev. Corp.*, 600 F. App'x 393, 403 (6th Cir. 2015) ("'Judges are not like pigs, hunting for truffles' that might be buried in the record.") (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)).

The next two Defendants named in their individual capacities, Gus Skinner and Ray Upchurch, apparently did not participate in the direct supervision or care of Rose.  The Administrators argue only that "Sheriff Skinner is responsible for hiring and firing the deputies who serve under him," and "Jailer Upchurch is also just as responsible for hiring and firing of the deputy jailers and making sure that each are properly trained." [R. 67 at 31.]  They expressly concede that Upchurch was "[n]ot directly involved in the supervision of Rose." [R. 67 at 34-35.]  Although these facts might prove relevant to a municipal liability claim, they are not enough to establish individual liability under § 1983.  To make Skinner or Upchurch personally liable for deliberate indifference, the Administrators must show that the supervisors "either encouraged the specific incident[s] of misconduct or in some other way directly participated in [them]." *Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir. 1999) (internal quotations and citation omitted).  No evidence indicates that either officer specifically encouraged and/or participated in an effort to disregard an obvious risk that Rose would overdose.

The fourth Defendant, Joe Horne, interacted with Rose for about two hours during and after a traffic stop. [R. 56 at 30.]  As outlined above, Horne recalls that Rose's "pupils were constricted and unresponsive to light being shone in them," that he was "a little bit slower getting his words out and maybe slightly slurred when speaking," and that he was "very unsteady" on his feet when asked to perform "heel to toes" and "one leg stand" sobriety tests. [R. 56-1 at 1.]  Horne later suggested that Rose was not "falling down" during the sobriety tests, but was simply "having trouble doing the test." [R. 56 at 12.]  He then transferred Rose into the custody of Officer Duncan, who reported that Rose was "awake and alert" during the transport, that he was "awake and alert when [they] went into [the] detention center," and that he was "alert and standing talking to [Duncan] when [the officer] left" the center. [R. 54-7 at 1.]

10

None of these facts support a reasonable inference that Horne (1) subjectively perceived an obvious risk that Rose would overdose and (2) chose to ignore the risk.  The Administrators' own expert, George Nichols, testified only that "pinpoint pupils" indicate someone has ingested a "fairly high concentration" of drugs.  [R. 53 at 38.]  He also expressly stated that "not . . . every person" who has "slurred speech" or "pinpoint pupils" should be "taken to the hospital," and only those who are "grossly intoxicated" should receive immediate medical care.  [R. 53 at 39.]  The Court adds, too, that jail personnel are not expected to possess the diagnostic expertise of a medical professional.  Liability attaches only when an official subjectively perceives and then disregards a risk "so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009).  Here, Horne testified that, through his training, he knew only that pinpoint pupils indicated a person was "generally on some type of pain medication possibly, you know, under the influence of it or a depressant."  [R. 56 at 8-9.]

The other two symptoms highlighted by the Administrators—Rose's "slightly slurred" speech and "very unsteady feet" during the sobriety test—are even less indicative of an imminent overdose.  Needless to say, "slightly slurred speech" is a common feature of a "generalized state of intoxication," and is plainly insufficient to support a deliberate indifference claim against Horne.  *See Border*, 414 F. App'x at 837.  And the fact that Rose "had trouble doing" two sobriety tests simply confirms what sobriety tests are designed to confirm—that Rose was not sober.  These routine signs of intoxication fall well short of establishing that Horne deliberately ignored an obvious risk of overdose.  *See Smith,* 338 F. App'x at 481-82 ("Although [the decedent] was clearly intoxicated, jail personnel had no indication that she was experiencing an

11

overdose, and she did not appear to exhibit symptoms that would make it objectively clear that she had overdosed or was in immediate need of medical attention.").

There is likewise no indication that Brad Tucker ignored an obvious risk that Rose would overdose. Tucker handled Rose's intake, and remembers that Rose "appeared fine," that his "[m]otor skills were good," and that he was walking and talking. [R. 59 at 7.] And in response to Tucker's screening questions, Rose suggested that he did not "have a serious medical condition that m[ight] require attention" and that he had not "recently ingested potentially dangerous levels of drugs or alcohol." [R. 54-10 at 1.] Rose also confirmed that he had provided "all the information that [he] wanted [the officers] to be aware of" while he was at the facility. [R. 54-10 at 1.] The Administrators find it significant that Tucker admitted inmates who "come[] in intoxicated" are usually "not going to tell the truth," and noted that Rose appeared to be "just saying no to all [his] questions, staring off." [R. 52 at 9.] But the simple fact that Rose was "staring off" during this interview fails to indicate more than a "generalized state of intoxication." *See Border*, 414 F. App'x at 837. And the mere knowledge that intoxicated inmates are often "not going to tell the truth," in the absence of any specific evidence that Rose had ingested a dangerous level of drugs, is equally insufficient to show deliberate indifference.

The Administrators' deliberate indifference claim against Jarvis is also unconvincing. Although they devote considerable attention to Jarvis's failure to check on Rose as frequently as facility policy required, they altogether fail to show that Jarvis subjectively perceived and then ignored an obvious risk that Rose would overdose. Here, the Administrators argue only that Jarvis "was on notice of Mr. Rose being in a detox cell." [*Id.* at 37.] But the knowledge that Rose was intoxicated, or even that Rose was "clearly intoxicated," is not enough to make a

12

deliberate indifference claim.  This knowledge, coupled with Jarvis's violation of the check-in policy, might plausibly support a negligence claim under state law; but the deliberate indifference standard "describes a state of mind more blameworthy than negligence."  *Woods*, 110 F.3d at 1222 (internal quotations and citation omitted).  Instead, the Administrators must provide evidence that Jarvis subjectively perceived and then ignored "symptoms that would make it objectively clear that [Rose] had overdosed or was in immediate need of medical attention."  *Smith,* 338 F. App'x at 481-82.  The Administrators have failed to make this showing.

      Lastly, the Administrators generally cite the recollection of one inmate that Rose appeared "sick" and was in "very rough shape" when he entered the detox cell.  [R. 58-1 at 11.]  This was not a contemporaneous report of Rose's condition, and there is no evidence that any inmates expressed concerns about Rose's medical needs prior to his death.  Instead, the inmate provided this assessment to Upchurch only after Rose had already overdosed.  The Court will not impute the subjective, post hoc impression of one inmate to all the officers who interacted with Rose in the hours preceding his death.  And in any event, these symptoms may have established that Rose was "clearly intoxicated," but did not suggest a risk "so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  *Spears*, 589 F.3d at 254; *see also Watkins,* 273 F.3d at 685 (finding no deliberate indifference where inmate "bent over like he was going to throw up," appeared "drunk or high," and "fell from a chair to the floor," where defendant otherwise denied swallowing drugs and did not request medical treatment).  At best, this inmate's impression might suggest that officers "*should have* known that [Rose] swallowed drugs."  *Watkins,* 273 F.3d at 685 (emphasis in original).  But this impression, standing alone,

cannot meet the high bar of showing that any Defendant actually perceived and then ignored an obvious risk of overdose.

Because (1) no evidence reasonably suggests that any Defendant subjectively perceived an obvious risk that Rose would overdose, and (2) Rose had no clearly established constitutional right to medical care without some objective indication of this risk, the Court finds that the individual Defendants are entitled to qualified immunity.  And even if the Defendants were not entitled to qualified immunity, the Administrators' claims would still fall short because they have failed to demonstrate that any Defendant showed deliberate indifference to Rose's serious medical needs.

Because no Defendant is individually liable for a constitutional violation, there can be no municipal liability for McCreary County's or Wayne County's alleged failure to supervise or train these Defendants.  *See, e.g, Smith v. Erie Cty. Sheriff's Dep''t*, 603 F. App'x 414, 418 (6th Cir. 2015) ("[I]f individual Defendants are not liable for a constitutional violation, the claims against their supervisors and the municipalities that employ them fail."); *Cooper v. County of Washtenaw*, 222 Fed. App'x 459, 473 (6th Cir. 2007) (holding plaintiff's municipal liability claim "is inextricably linked to the plaintiff's first claim: If the individual defendants have violated no constitutional right, the municipality cannot be liable under § 1983"); *Watkins*, 273 F.3d at 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.").

## C

Having dismissed all of the Administrators' federal claims, the Court must now decide whether to exercise supplemental jurisdiction over the remaining state law claims.  Under 28 U.S.C. § 1367(c)(3), the Court "may decline to exercise supplemental jurisdiction over a claim"

if it "has dismissed all claims over which it has original jurisdiction."[5]  In weighing whether to "refuse to exercise" this jurisdiction, courts will take "into account such factors as the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 158 (1997).  This Circuit has also held that "[a] federal court that has dismissed a plaintiff's federal-law claims should ordinarily not reach the plaintiff's state law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).  Courts should thus exercise this jurisdiction sparingly "to avoid needless decisions of state law." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007).

The Court finds no exceptional grounds for exercising supplemental jurisdiction in this case.  In particular, the Court notes that many of the Administrators' state law claims involve unsettled issues of state law, including (1) complex questions surrounding legal and medical causation in this context and (2) the question of whether 501 KAR creates a private right of action.  In order "to avoid needless decisions of state law," the Court will decline to exercise supplemental jurisdiction here.  *Id.*  The Court directs the parties to 28 U.S.C. § 1367(d), which explains the impact of dismissal on the statutes of limitation for the Administrators' state law claims.

### III

The Administrators have failed to demonstrate that any Defendant showed deliberate indifference to Rose's serious medical needs.  And the Court finds no cause to exercise

---

[5] The Administrators brought this suit under 28 U.S.C. §§ 1331, which gives district courts original jurisdiction "over civil actions arising under the Constitution, laws, or treaties of the United States." [R. 100 at 3.]  The only claims over which the Court has original jurisdiction, then, are the Administrators' federal law claims.

supplemental jurisdiction over the Administrators' remaining state law claims. Accordingly, the Court **HEREBY ORDERS** as follows:

   (1)   The Administrators' Motion for Partial Summary Judgment **[R. 48]** is **DENIED**;

   (2)   The Defendants' Motion for Summary Judgment **[R. 54]** is **GRANTED**;

   (3)   The Administrators' state law claims are **DISMISSED WITHOUT PREJUDICE**; and

   (4)   Judgment shall be entered accordingly.

This 24th day of August, 2016

Gregory F. Van Tatenhove
United States District Judge